UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT JOHN HOTOP,<br><br>*Plaintiff*,<br><br>v.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>*Defendant.* | Civil Action No. 18-15312<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Defendant Prudential Insurance Company of America's ("Prudential" or "Defendant") Motion for Summary Judgment against Plaintiff Robert John Hotop ("Plaintiff" or "Hotop") under Federal Rule of Civil Procedure 56(c). ECF No. 59. Plaintiff opposes the Motion. ECF No. 64. For the reasons set forth herein, Defendant's Motion is **GRANTED**.

**I. BACKGROUND**[1]

This action arises from a dispute over whether Plaintiff is entitled to $100,000 or $1,000,000 from Prudential due under a life insurance policy.

### A. Plaintiff's Life Insurance Policy During His Employment

Plaintiff is a former employee of United Parcel Service ("UPS"). Def. SOMF ¶ 23. During his tenure at UPS, Plaintiff received welfare benefits and coverage for his spouse, Patricia Hotop ("Patricia"), through "The UPS Flexible Benefits Plan" (the "Plan"). Id. ¶¶ 1, 24. The Plan

---

[1] Unless otherwise indicated, the Court draws the following facts from Defendant's Statement of Material Facts ("Def. SOMF"), ECF No. 59.12, Plaintiff's Supplemental Statement of Material Facts ("Pl. Supp. SOMF"), ECF No. 64.2, that are not in dispute, and the parties' responses to those submissions, see ECF No. 64.1 ("Pl. Response to Def. SOMF"); ECF No. 65.1 (Def. Response to Pl. Supp. SOMF").

1

provided life insurance benefits to employees through a group insurance contract between UPS and Prudential, which designated Prudential as the Plan's claims administrator (the "Group Contract").[2]  Id. ¶ 8.  The Plan permitted employees to obtain up to $500,000 in supplemental dependents term life insurance ("SDTLI Coverage") for their spouses.  Id. ¶¶ 11-12.  While employed at UPS, Plaintiff received $360,000 in supplemental term life insurance coverage for himself and $100,000 in SDTLI Coverage for Patricia.  Id. ¶ 25.

### B. Plaintiff's Election to Port His Life Insurance Policy After Retirement

On October 1, 2017, Plaintiff retired from UPS.  Id. ¶ 26.  Upon his retirement, Plaintiff received a notice from UPS that he could continue the insurance coverage he had during his employment by electing one of two options.  See id. ¶ 27.  The first option—conversion—would allow Plaintiff to convert his supplemental coverage to an individual whole life policy.  Id. ¶ 15.  The second option—portability—would allow him to continue his coverage at group rates.  See id.[3]  Plaintiff called Prudential on October 30, 2017 to inquire about the difference between [**deleted word**] porting and converting his coverage and spoke with a Prudential representative.  Id. ¶¶ 29-30.  During that call, Plaintiff expressed that he wished to "stick with the portability" option.  Id. ¶ 31.

On November 13, 2017, Prudential sent Plaintiff a letter, notifying him that he could continue "the same amount of coverage that was in force on the last day of [his] active service" under the portability provision, and that he would move to a Prudential standard portability rate after the first full year of ported coverage.  See id. ¶¶ 34-35; see also Declaration of Angle ("Angle

---

[2] Plaintiff does not dispute UPS and Prudential had a group contract or that the group contract designated Prudential as claims administrator.  He claims, however, that the Plan provided life insurance benefits through that contract to active employees only.  See Pl. Response to Def. SOMF ¶ 8.

[3] The parties dispute whether the portability option allowed participants like Plaintiff to continue coverage under the Plan.  See Def SOMF ¶ 15; Pl. Response to Def. SOMF ¶ 15.  A fulsome description of this dispute is later described herein.

Decl.") Ex. B at Pru1000, 59.11. The letter also directed Plaintiff to sign and return a "Portability Election form" to Prudential if he wished to continue his coverage "on a portable basis." Angle Decl. Ex. B at Pru1000.

On November 20, 2017, Plaintiff called Prudential again, and he told a Prudential representative, among other things, that he wished to "continue [Patricia's coverage] which was roughly $100,000." Def. SOMF ¶¶ 36, 39. Plaintiff executed the Portability Election form, electing to continue his supplemental term life insurance and Patricia's SDTLI coverage "as a portable participant," and faxed it to Prudential on December 11, 2017. Id. ¶ 43-47.

On December 19, 2017, Prudential sent Plaintiff an automatically generated billing notice for $2,359.80 in premiums for the period of October 1, 2017 to March 31, 2018. Id. ¶ 73; see also Angle Decl. Ex. D (the "Billing Notice"). The Billing Notice also reflected a summary of Plaintiff's coverage as follows:

```
The Below Plan Description Reflects Your Coverage(s) as of: January 1, 2018
Plan Description              Insurance Amount
Optional Life (11)               $368,000
ODL-Spouse (10)                $1,000,000
```

On January 2, 2018, after receiving the Billing Notice, which indicated $1,000,000—rather than $100,000—in SDTLI Coverage for Patricia, Plaintiff called Prudential to "make sure what [his] coverage is and what [his] costs are." See Def. SOMF ¶ 80. Plaintiff asked the responding Prudential representative, Kyle, to "break down what [his] insurance is and what [his] wife's insurance is and the costs for the two[.]" Id. When Plaintiff asked specifically about his wife's coverage, Kyle stated, "it does look like that is set [at] a million dollars. That is $345.00 monthly." Id. ¶ 81. After that phone call, Plaintiff paid the premium amount listed on the Billing Notice. Id. ¶ 86; see also Pl. Supp. SOMF ¶ 39. On January 30, 2018, Plaintiff called Prudential and again spoke with Kyle, who confirmed that Plaintiff's coverage "was approved" and was "effective as

of 11/1/2017." Id. ¶ 88.  Prudential later electronically drafted a premium payment from Plaintiff's bank account for the period of January 2018 to March 2018.  Pl. Supp. SOMF ¶ 40.

One day before Plaintiff first called Prudential to discuss the rates reflected on the Billing Notice, on January 1, 2018, the Group Contract terminated for active UPS employees.  Id. ¶ 20. The parties dispute the effect of this termination on Plaintiff as a UPS retiree.[4]  See Def. SOMF ¶¶ 21-22; Pl. Response to Def. SOMF ¶¶ 21-22.  Prudential claims that despite the Group Contract's termination, certain retirees like Plaintiff continued coverage under the Plan.  See id. Prudential calls these individuals "UPS Continuees."  Id.  Plaintiff, however, claims that he and other retirees with ported coverage under the Plain were "transferred to the Prudential Standard Port Plan and separated entirely from the UPS ERISA Plan."  Pl. Response to Def. SOMF ¶¶ 21-22; see also Pl. Supp. SOMF ¶¶ 7-9.  According to Plaintiff, after his policy was transferred to the Prudential Standard Port Plan, "UPS had no involvement, or administrative or financial obligation or burden relating to life insurance Prudential provided to Hotop" and it "made no contributions" to Plaintiff's policy.  Pl. Supp. SOMF ¶¶ 10-12.

### C. Plaintiff's Claim for SDTLI Benefits

Patricia Hotop passed away on February 4, 2018.  Def. SOMF ¶ 92.  On March 6, 2018, Plaintiff called Prudential to make a claim for SDTLI benefits.  Id. ¶ 93.  During the call, Plaintiff requested to verify the amount of Patricia's SDTLI coverage, but the Prudential representative to whom he spoke told Plaintiff he could not provide that information.  Id. ¶ 95.  Plaintiff called Prudential again the next day and made the same request.  See id. ¶ 96.  Prudential advised him

---

[4] The parties do not dispute that the Plan in effect before the Group Contract's termination was an ERISA plan.  See Def. SOMF ¶ 7.

4

that it could provide "the value amount of the policy" upon its receipt of Plaintiff's claim form. Id.  Plaintiff then faxed a claim form to Prudential on May 10, 2018.  Id. ¶ 97.

On May 7, 2018, Prudential sent Plaintiff a letter, explaining that it had separately mailed Plaintiff a "refund" check in the amount of $1,380.00.  See id. ¶ 100; see also Angle Decl. Ex. C. Prudential claimed this amount represented Plaintiff's "overpayment of premiums for Patricia['s] . . . life insurance coverage" under the Plan.  Id.  On May 16, 2018, Prudential sent Plaintiff a second check in the amount of $101,640.53, which Prudential claims represented Patricia's SDTLI benefits of $100,000, plus interest of $1,640.53.  Id. ¶ 99.

Plaintiff submitted a written claim for $1,000,000 in SDTLI benefits on August 16, 2018, which Prudential denied on September 27, 2018.  Id. ¶¶ 101-02; see also Angle Decl. Ex. A at Pru359-62, 375-78 (the "Claim Denial Letter").  In rejecting Plaintiff's new claim, Prudential explained that only Plaintiff's pre-retirement "existing coverage c[ould] be ported" under the "Group Policy," and "the Group Policy limits [SDTLI] to $500,000, does not permit increases above $25,000 without . . . evidence of insurability, and does not permit dependent coverage at a level higher than the employee's own coverage."  Claim Denial Letter at Pru 376.  Prudential also indicated that it "mistakenly billed" Plaintiff "for premiums on $1,000,000.00 of [SDTLI] instead of the $100,000 he ported" due to an "administrative error."  Id.  It advised Plaintiff that it refunded the incorrect premium amounts he paid, and because "the plan documents have been clear in stating that only $100,000 in coverage could have been in force," denied Plaintiff's claim for an additional $900,000.  Id.

On January 4, 2019, Plaintiff appealed Prudential's claims decision, which Prudential denied on April 2, 2019.  Def. SOMF ¶¶ 105-06; see also Angle Decl. Ex. A at Pru386-89 (the "Appeal Denial Letter").  Prudential again reiterated the administrative error that caused Plaintiff's

5

Billing Notice to mistakenly reflect $1,000,000 in SDTLI coverage and the Plan's terms limiting his SDTLI coverage. Appeal Denial Letter at Pru387-88. Prudential further indicated that Plaintiff should have contacted it "immediately" after receiving the Billing Notice to notify it of the error, but he did not, and thus Prudential did not discover the error until Patricia passed away. Id. at Pru388.

### D. Procedural History

On September 28, 2018, Plaintiff filed the instant action in the Superior Court of New Jersey, Essex County. ECF No. 1.1 (the "Original Complaint"). Through the Original Complaint, Plaintiff alleged a series of common law claims against Prudential related to Prudential's failure to pay his life insurance claim upon his wife's death. On October 25, 2018, Prudential removed the matter to this Court, asserting that the Court has jurisdiction over Plaintiff's claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. ECF No. 1. Plaintiff did not file a motion to remand. Instead, he twice amended the Original Complaint to include claims under ERISA. See ECF Nos. 8, 38 (the "Second Amended Complaint" or "SAC"). The Second Amended Complaint alleges three common law claims and three "alternative" ERISA claims against Prudential: (1) breach of contract ("Count One"); (2) breach of the duty of good faith and fair dealing ("Count Two"); (3) breach of fiduciary duty ("Count Three"); (4) ERISA breach of contract ("Count Four"); (5) ERISA breach of fiduciary duty ("Count Five"); and (6) ERISA equitable estoppel ("Count Six"). SAC ¶¶ 19-77.

On November 22, 2019, after discovery commenced, Plaintiff filed a motion to remand, arguing that ERISA does not govern the supplemental life insurance policy. ECF No. 53. Prudential filed the instant Motion for Summary Judgment on December 23, 2019, while Plaintiff's remand motion was pending. See ECF No. 59. Plaintiff filed an opposition to Prudential's Motion

on January 21, 2019.  ECF No. 64.  On February 4, 2020, Magistrate Judge Hammer issued a Report and Recommendations ("R&R"), recommending that the Court deny Plaintiff's remand motion based on his addition of ERISA claims to his amended pleadings.[5]  ECF No. 69.  The Court adopted Judge Hammer's R&R on June 18, 2020.  ECF No. 72.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), the Court should grant summary judgment when there is no genuine issue as to any material fact "'that would permit a reasonable jury to find for the nonmoving party,'" Boyle v. Cty. of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citation omitted), and "the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the Court does not "weigh the evidence to determine the truth of the matter," but rather assesses "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986).

The Court construes all facts and inferences in the light most favorable to the non-moving party, see Boyle, 139 F.3d at 393, and the moving party bears the initial burden of demonstrating that no genuine issue of material fact remains, see Celotex Corp., 477 U.S. at 322-23.  If the moving party meets its burden, the non-moving party must present evidence demonstrating a genuine issue of material fact for trial.  See Anderson, 477 U.S. at 248-49.  A non-moving party's "[u]nsupported allegations, subjective beliefs, or argument" cannot alone overcome a properly supported summary judgment motion.  V.C. by Costello v. Target Corp., 2020 WL 1864611, at *4 (D.N.J. Apr. 14,

---

[5] Judge Hammer found remand would be improper because Plaintiff's addition of well-pleaded ERISA claims conferred original jurisdiction on the Court under 28 U.S.C. 1131.  R&R at 12.  He did not reach whether ERISA governs this dispute.

2020). If the non-moving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" summary judgment is warranted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 59 n.5 (3d Cir. 1992) (internal quotation marks and citation omitted).

### III. ANALYSIS

Plaintiff's Second Amended Complaint contains both New Jersey common law claims and ERISA claims. The Court must first determine whether ERISA governs this action before it resolves whether genuine issues of material fact preclude summary judgment.

#### A. ERISA Applies to Plaintiff's Claims

As noted earlier, there is no dispute that the Plan is governed by ERISA. See Def. SOMF ¶ 7. Rather, Plaintiff maintains that when the Group Contract terminated, his post-retirement, continued coverage under the Plan "transferred to the Prudential Standard Port Plan – which was new coverage, completely separate from the UPS Plan." Pl. Br. at 12, ECF No. 64. Prudential counters that Plaintiff's decision to port, rather than convert, his life insurance policy continued his coverage under the Plan, which is subject to ERISA. See Def. Br. at 7-8; Def. Reply Br. at 6, ECF No. 65. The Court agrees with Prudential that ERISA governs this action.

"ERISA's framework ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits." In re Unisys Corp. Retiree Med. Ben. "ERISA" Litig., 58 F.3d 896, 902 (3d Cir. 1995). The Court therefore must "look to the plan documents to interpret plan obligations," and if the "plan is clear an

unambiguous . . . must determine its meaning as a matter of law without looking to extrinsic evidence." In re Lucent Death Ben. ERISA Litig., 541 F.3d 250, 254-55 (3d Cir. 2008). Here, because Prudential argues ERISA applies as Plaintiff's ported life insurance is not separate from the Plan, the Court must first examine the Plan documents' plain language for supplemental term life insurance portability.

According to the Plan's Summary Plan Description (the "SPD"), upon a UPS employee's retirement, "the portability option lets [them] continue supplemental term life insurance," and Prudential bills the retiree directly. Declaration of Bryan Brum ("Brum Decl.") Ex. B at Pru256, ECF No. 59.4. The SPD further states that a retiree's "group rates will no longer be the same as rates available to active UPSers, but will be based on a group made up of many Prudential customers." Id. The retiree may, however, "keep up the current amount of [their] insurance without providing any evidence of insurability." Id. The SPD refers the retiree to the Prudential Enrollment Kit (the "PEK") for more information. Id. at Pru257.

Like the SPD, the PEK provides that the portability option allows retirees "to continue [their] group life insurance at group rates" but that those rates "will be 120% of the rate schedule [they] had [as] an employee of UPS." Id. at Pru322. In a separate section entitled "Termination of Coverage," the PEK states that a UPS employee's supplemental term life coverage ends when their coverage under the Plan ends but that they may "<u>continue [their] coverage by either electing to continue [their] group term life coverage under the portability provision or converting it to a Prudential individual life insurance policy</u>." Id. (emphasis added).

Based on the foregoing, the Court finds that by electing the Plan's portability provision, Plaintiff continued his coverage under the Plan, albeit on modified terms (i.e. different group rates), rather than under an individual Prudential life insurance policy. While the SPD does not

9

itself explain the portability option's effect on one's coverage under the Plan, the PEK, which the SPD incorporates by reference, see id. at Pru252, clears up any ambiguity. By its plain terms, the PEK provides that ported coverage is continued group term life coverage under the Plan, while converted coverage is an individual Prudential life insurance policy separate from the Plan. Id. at Pru322. Contrary to Plaintiff's contention, neither the Group Contract nor the Group Contract Certificate of Coverage, see Declaration of Karen Petrone ("Petrone Decl.") Exs. A-B, ECF No. 59.6, appear to contradict the SPD or the PEK. Rather, consistent with the SPD and the PEK, the Group Contract Certificate of Coverage provides that a retiree may elect to receive "similar coverage under the Portability Plan" when their supplemental term life coverage under the Group Contract ends and that the terms "will not be the same as those under the Group Contract." Petrone Decl. Ex. B at Pru45. Likewise, the Group Contract Certificate of Coverage distinguishes the portability option from the "conversion privilege," which converts the retiree's coverage "to an individual life insurance contract." Id. at Pru41. Read together, the Plan documents make clear that by electing the portability option, Plaintiff continued his group term life coverage under the Plan. ERISA thus governs this dispute.[6]

That the Group Contract terminated on January 1, 2018 does not alter this conclusion. The SPD explicitly provides that coverage for UPS retirees who elected the Plan's portability option would survive the Group Contract's termination:

> If UPS' participation in the master contract terminates, his/her portability coverage will continue. You will be moved to the Prudential standard port rate structure after one year and your rates will increase.

---

[6] Case law on whether ERISA governs ported health insurance policies is novel and undeveloped. At least one court in this District, however, has held that ERISA governs ported coverage, distinguishing it from converted coverage. See Horan v. Reliance Std. Life Ins. Co., No. 12-7802, 2014 WL 346615, at *5-6 (D.N.J. Jan. 30, 2014). According to Horan, ported coverage—unlike converted coverage that is "arguably independent from the ERISA plan because it involves a new policy issued to an individual"—allows "a former employee [to] maintain optional coverage through the employer's group policy on the same terms for a period of time." Id. at *5 (citations omitted). Based on the particular facts presented here, the Court agrees with the reasoning in Horan.

Id. (emphasis added). Because the Plan documents' plain language is clear that the portability option does not create an individual policy separate from the Plan, and that the Group Contract's termination did not affect retirees' ported coverage, the Court need not consider extrinsic evidence submitted by the parties. See In re Lucent Death Ben. ERISA Litig., 541 F.3d at 254-55. The Court concludes, as a matter of law, that ERISA governs Plaintiff's ported life insurance policy.[7]

Because ERISA governs this action, summary judgment is warranted on Plaintiff's state law claims in Counts One, Two, and Three. ERISA expressly preempts "any and all State laws insofar as they . . . relate to any employee benefit plan" covered under the statute. 29 U.S.C. § 1144(a). "State laws 'relate to' an ERISA plan if the law either has a 'reference to' or has a 'connection with' the plan at issue." Sleep Tight Diagnostic Ctr., LLC v. Aetna Inc., 399 F. Supp. 3d 241, 249 (D.N.J. 2019) (citation omitted). Here, there is no doubt that Plaintiff's state law claims are preempted because they relate to the Plan; it is the reason Plaintiff amended his original pleading to include ERISA claims. Accordingly, the Court dismisses Plaintiff's common law claims in Counts One, Two, and Three.

### B. Plaintiff's ERISA Claims

Having concluded that ERISA governs Plaintiff's claims, the Court now turns to whether those claims can withstand summary judgment.

#### i. Count Four: ERISA Breach of Contract

As a preliminary matter, the Court grants summary judgment on Plaintiff's ERISA breach of contract claim because Plaintiff "concedes that if . . . [his] coverage is under the UPS Plan, ERISA governs and bars [his] claim for more than $100,000 in death benefits." Pl. Br. at 9. The

---

[7] It bears noting that despite Plaintiff's insistence that his post-retirement insurance coverage is under a separate "Prudential Standard Port Plan," Plaintiff did not produce any independent Prudential plan documents in opposition to Defendant's Motion.

11

Court thus need not inquire further as there is no genuine issue of material fact on this claim. Summary judgment on Count Four is granted.

### ii. Counts Five and Six : ERISA Breach of Fiduciary Duty and Equitable Estoppel

Prudential next argues that it is entitled to summary judgment on Plaintiff's breach of fiduciary duty claim because: (1) Prudential did not act as a fiduciary in producing and mailing the Billing Notice; and (2) Plaintiff did not detrimentally rely on the Billing Notice because he "knew precisely how much coverage he was porting" when he elected the portability option. Def. Br. at 18-21. Prudential similarly argues that summary judgment is warranted on Plaintiff's ERISA equitable estoppel claim because Plaintiff has not demonstrated detrimental reliance. Def. Br. at 13-18. The Court agrees that, based on the record, Plaintiff cannot satisfy the detrimental reliance element to support either claim.

To prevail on a breach of duty claim under ERISA, Plaintiff must establish that "(1) the defendant was acting in a fiduciary capacity; (2) the defendant made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (3) the misrepresentation or inadequate disclosure was material; and (4) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure." Finnegan v. Medco Health Sols., Inc., No. 14-7184, 2017 WL 3208347, at *5 (D.N.J. July 27, 2017) (quoting In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 579 F.3d 220, 228 (3d Cir. 2009)).

ERISA fiduciaries are defined "in functional terms of control and authority over the plan." Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993); see also Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 413 (3d Cir. 2013). Accordingly, the term "fiduciary" under ERISA is broadly construed. Currcio v John Hancock Mut. Life Ins. Co., 33 F.3d 226, 233 (3d Cir. 1994). As for reliance, Plaintiff must show he took "some action as a result of the misrepresentation or omission;

the mere expectation of a continued benefit is not enough." Shook v. Avaya, Inc., 625 F.3d 69, 73 (3d Cir. 2010).

The Court first finds unpersuasive Prudential's argument that it did not act in a fiduciary capacity in preparing and mailing the Billing Notice to Plaintiff. Although those who perform "purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles," Confer v. Customs Engineering Company, 952 F.2d 34, 39 (3d Cir. 1991), that is not the case here. Prudential concedes that the Plan delegated discretionary authority to it to interpret the Plan and decide benefits eligibility. Def. SOMF ¶ 9.

Nonetheless, summary judgment is warranted on Count Five because Plaintiff has not established he detrimentally relied on Prudential's misrepresentations about his life insurance policy. "In demonstrating sufficient reliance, the plaintiff must have taken some action as a result of the misrepresentation; the mere expectation of a continued benefit is not enough." Shook, 625 F.3d at 73. Here, Plaintiff conceded that he made no changes in his life or financial planning or purchases on the expectation that Patricia's SDTLI coverage would be $1,000,000. Deposition of Robert Hotop ("Hotop Dep.") at 101:22-102:6, ECF No. 59.2. Plaintiff neither claims nor points to record evidence showing that he decided not to consider other life insurance policy options in reliance on Prudential's misrepresentations after he elected to port his coverage under the Plan. Nor is there evidence that Plaintiff considered other life insurance policies before he elected to port his insurance. Plaintiff admits that he originally sought to continue only $100,000 in SDTLI coverage, see id. at 34:8-11, and elected to port his life insurance coverage because the premium rate was cheaper as a subsidized plan. See Def. SOMF ¶ 58; Pl. Response to Def. SOMF ¶ 58. Plaintiff also admits that he understood Patricia, given her medical condition, would not be able to

provide evidence of insurability. Def. SOMF ¶ 60; Pl. Response to Def. SOMF ¶ 60; see also Hotop Decl. at 28:17-25.

Having failed to proffer evidence on which one could find Plaintiff detrimentally relied on Prudential's misrepresentations, Plaintiff cannot succeed on his ERISA breach of fiduciary claim in Count Five.[8] Likewise, because an ERISA equitable estoppel claim also requires detrimental reliance, see Pell v. E.I. DuPont de Nemours & Co. Inc., 539 F.3d 292, 300 (3d Cir. 2008) (explaining that ERISA equitable estoppel requires plaintiff to "establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances") (emphasis added), Plaintiff cannot prevail on Count Six. Accordingly, Prudential is entitled to summary judgment on Counts Five and Six.

## IV. CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment, ECF No. 59, is **GRANTED**. An appropriate Order follows.

Dated: July 30, 2020

/s Madeline Cox Arleo
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**

---

[8] That Plaintiff paid premiums to Prudential in amounts based on the Billing Notice's $1,000,000 coverage is insufficient to show detrimental reliance. The record shows that Prudential refunded Plaintiff a check for premium payments made in excess of the $100,000 ported policy. See Def. SOMF ¶ 100; Angle Decl. Ex. B at Pru1004.